**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **Raymond L. Hicks**, | Civ. No. 10-2930 (DWF/AJB) |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| **v.** | |
| **Michael J. Astrue,** | |
| **Commissioner of Social Security**, | |
| Defendant. | |

_____

**INTRODUCTION**

Plaintiff Raymond Hicks disputes the unfavorable decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB"). The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a Report and Recommendation to the District Court on the parties' cross-motions for summary judgment.  See 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1.  Plaintiff is represented by James H. Greeman, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.  Jurisdiction is proper under 42 U.S.C. § 405(g). Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 6] be denied, and Defendant's motion for summary judgment [Docket No. 9] be granted.

1

**PROCEDURAL HISTORY**

Plaintiff filed an application for disability insurance benefits on January 9, 2006, alleging disability beginning September 30, 2005.  (Tr. 98-99.)[1]  He alleged disability from chronic headache, chiari I malformation,[2] degenerative disc disease, sleep apnea, restless leg syndrome, and hypertension.  (Tr. 144.)  His application was denied initially and upon reconsideration.  (Tr. 63-67, 69-71.)  Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on July 7, 2008, before Administrative Law ("ALJ") George Gaffaney.  (Tr. 72, 22-54.)  The ALJ issued an unfavorable decision on October 9, 2008.  (Tr. 11-21.)  On May 10, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5.)  See 20 C.F.R. § 404.981. On July 6, 2010, Plaintiff sought review from this Court.  The parties thereafter filed cross-motions for summary judgment.

**PLAINTIFF'S BACKGROUND AND MEDICAL HISTORY**

Plaintiff was born on October 8, 1953, and was 51-years-old on the alleged onset date of September 30, 2005.  (Tr. 98.)  Plaintiff is married and has two children, aged ten and nine at the time of the hearing.  (Tr. 27.)  He has a master's degree in electrical

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 4, as "Tr."

[2] Chiari malformations are structural defects in the cerebellum, the part of the brain that controls balance. http://www.ninds.nih.gov/disorders/chiari/chiari.htm  Type I is the most common and many people with Type I are asymptomatic.  Id.

engineering.  (Tr. 251.)  He worked for IBM as an engineer for 29 years.  (Tr. 252.)

Plaintiff was in a car accident in April 1999.  (Tr. 507-12.)  This is when his chronic

headaches began.  (Tr. 145.)  He quit working on September 30, 2005, because he

could no longer adequately perform his job.  (Id.)  He was in another car accident in

November 2005.  (Tr. 220-22.)

**MEDICAL RECORDS**

The medical record begins substantially before Plaintiff's alleged disability onset

date, when he was treated in an emergency room at Mayo Clinic after being involved in

a car accident on April 22, 1999.  (Tr. 507-14.)  Plaintiff was wearing his seat belt and

the air bag deployed during the accident.  (Tr. 507.)  He had multiple abrasions and

contusions, including on his forehead.  (Id.)  On examination, he was neurologically

intact.  (Tr. 509).  He was diagnosed with headache and advised to use over-the-

counter Tylenol and return if symptoms persisted more than seven days.  (Tr. 513.)

Plaintiff continued to be treated at Mayo Clinic.  (Tr. 515.)  In June 1999, Plaintiff

complained of a persistent headache, which he rated at level three to five out of ten,

and it increased with any activity.  (Id.)  He was diagnosed with post traumatic

headache and advised that it should resolve in one month.  (Tr. 516.)  By May 2000, his

headaches were worsening.  (Tr. 519-20.)  However, a comprehensive neurological

examination by Dr. Rose Dotson was normal.  (Tr. 521-22.)  Plaintiff had some

symptoms of post-concussion syndrome.  (Tr. 522.)

Plaintiff was under a lot of stress and was chronically sleep deprived in August 2000. (Tr. 527-28.) Dr. Michelle Taylor, a psychologist at Mayo Clinic, recommended relaxation therapy. (Tr. 528.) She stated, "[i]t is likely that his tendency to worry and hold himself stiffly play a maintaining role in the headaches. It also appears that he has difficulty managing his many stressors." (Id.) After Plaintiff had physical therapy in November 2000, Dr. Brian Grogg at Mayo Clinic opined that there was a lack of muscular findings to explain Plaintiff's continued headaches, and he did not respond to physical therapy. (Tr. 540.) On January 11, 2001, Dr. Shelley Cross, a neurologist at Mayo Clinic stated:

> I agree with Dr. Dotson that these appear to be mainly muscle contraction headaches. . . I think a lot of things are feeding this including worry that they may never go away, muscle tension at his workplace, sitting in front of a computer all day, awkward lifting of his two toddlers, lack of a good amount of sleep, stresses of illness in his child and also some surgeries that his wife had and as he notes himself a personality with concern for detail and having everything just so.

(Tr. 542.)

However, an MRI taken on June 22, 2001 raised concern that Plaintiff was having low pressure headaches. (Tr. 546.) It showed diffuse pachymeningeal enhancement and low lying cerebellar tonsils. (Id.) Additional testing was done to look for a cerebrospinal fluid leak ("CSF").[3] (Tr. 546-47.) On July 30, 2001, Dr. Bahram

---

[3]     Symptoms of CSF leak may include a headache that is worse when sitting up and better when lying down, which may be associated with light sensitivity, nausea, and neck stiffness. http://www.nlm.nih.gov/medlineplus/ency/article/001068.htm

Mokri, a neurologist at Mayo Clinic, noted that radio-isotope cisternography[4] did not indicate that Plaintiff had a definite source of CSF leak.  (Tr. 549.)  CSF leak was still a suspected cause of Plaintiff's headaches, because it was consistent with the findings on MRI of his head and his history.  (Id.)  Plaintiff continued to have many tests and treatment for headaches caused by CSF leak, including epidural blood patches[5] and lumbar drain.  (See Tr. 551-57, 560-578, 600.)  He also tried various medications and an abdominal binder, none of which helped much.  (Tr. 579-82, 588, 593-600.)  Overall, his headaches were getting worse.  (Tr. 589.)  As of October 2003, none of the tests were able to detect a CSF leak.  (Tr. 682-83.)

Plaintiff began seeing Dr. Charles Ormiston at Neurological Associates of St. Paul in July 2003.  (Tr. 669-70.)  At first, Dr. Ormiston believed Plaintiff's headaches were probably caused by CSF leak.  (Tr. 670.)  After more testing, and then a lumbar drain in October 2003, Dr. Ormiston stated, "we have not been able to clearly demonstrate a leak, either at our facility or at Mayo, and  I have been suspicious that the problem may be neck rather than spinal leak."  (Tr. 671-79, 682-83.)  Plaintiff had an MRI of his cervical spine, which indicated "fairly significant disc space narrowing at C5-6 and C6-7 and lack of a normal cervical lordosis."  (Tr. 687.)  Dr. Ormiston recommended

---

[4]     Radioisotope is an isotope that changes to a more stable state by emitting radiation.  Stedman's Medical Dictionary 1505 (27th ed. 2000). Cisternography is the radiographic study of the basal cisterns of the brain. Id. at 357.

[5]     An epidural blood patch is a treatment for headaches occurring after a lumbar puncture. http://www.medicinenet.com/script/main/art.asp?articlekey=79445

work restrictions of 35-40 hours per week with no overtime and "limitation for lifting and of weight." (Id.)  Plaintiff had some relief with a trial of cervical traction, but he wasn't sure it was the traction that provided relief.  (Tr. 625-26.)

In a letter to Plaintiff's insurance company on March 25, 2004, Dr. Ormiston stated that Plaintiff's chiari formation was mild and not likely to have anything to do with his problems.  (Tr. 684.)  He also stated Plaintiff was "really doing very well."  (Id.)  He summarized Plaintiff's condition as follows:

> "I have told him today, given the fact that he has a completely normal examination, given the fact that he has had exhaustive study looking for more correctable problem, without any evidence of abnormalities, that he should return to as active a life-style as he is comfortable doing.  I have recommended getting into an exercise program. . . He has not had a cerebrospinal fluid leak.  We had looked for that, on several occasions, and I would say unequivocally that there is no cerebrospinal fluid leak. At present, he has had headaches and neck pain, that I would attribute to the motor vehicle accident and he has no more than that."

(Id.)

In May, Plaintiff was evaluated for insomnia at Mayo Clinic.  (Tr. 632-40.) Plaintiff described his hectic day, working and caring for his children, and he could not relax until after midnight.  (Tr. 632.)  Polysomnography showed upper airway resistance syndrome and restless leg syndrome.  (Tr. 637, 639-40.)  Plaintiff was prescribed a CPAP,  medication for restless leg syndrome, and another oral appliance, which he often used instead of the CPAP.  (Tr. 639, 225-26.)  These treatments were effective for his sleep impairments.  (Tr. 225-26, 284, 651.)

6

Plaintiff began to have some difficulties with a new manager at work who did not feel he was performing up to expectations.  (Tr. 651, 686.)  Dr. Ormiston wrote letters on Plaintiff's behalf in November 2004 and again in March 2005.  (Tr. 665, 666-67.)  In both letters, Dr. Ormiston stated that Plaintiff's headaches were not caused by a spinal fluid leak, and his diagnosis was chronic tension type headaches.  (Tr. 666.)  He opined that Plaintiff was not malingering, and he was limited to how long he could work productively.  (Tr. 667.)  He suggested Plaintiff could not work overtime, and also may not be able to work productively for a 40-hour week.  (Tr. 665-67.)  On March 9, 2005, Dr. Ormiston noted Plaintiff was having difficulty working six hours a day.  (Tr. 232.)

Three months later, Dr. Ormiston noted:

> He is actually doing better, I believe. We had increased the Lexapro a bit. . . I encouraged him to stick with it and he is pleased that he got some positive feedback from his boss. He said they're going to be forming a committee to review this and I encouraged him again to fight through this the best he can and work as hard as he can.  He actually seems to have a bit of a better attitude today.

(Tr. 231).  However, Plaintiff's last day of work was September 30, 2005, his alleged onset of disability date.  (Tr. 144-45.)

Plaintiff went to the Mayo Clinic emergency room on November 2, 2005, after being involved in a car accident.  (Tr. 221-24.)  His car was rear ended, but he was wearing his seat belt, and the air bag did not deploy.  (Tr. 221.)  He had some slight neck pain and his usual headache was worse.  (Id.)  The ER physician stated, "[a]ll I am seeing is relatively mild muscular neck pain that probably exacerbated his chronic

headaches." (Tr. 222.)  When Plaintiff was discharged it was noted that, "the patient has no functional deficits.  The patient is able to return to previous level of functioning." (Tr. 224.)  A month later, Plaintiff reported to Dr. Ormiston that he had recovered "for the most part" from his "whiplash injury."  (Tr. 229.)

Plaintiff underwent a psychological evaluation on April 10, 2006, with licensed psychologist Kristi Meyer at Associates in Psychiatry and Psychology, P.A.  (Tr. 251-53.)  Meyer noted Plaintiff had a master's degree in electrical engineering, and was married with two children.  (Tr. 251.)  He was employed with IBM as an engineer from 1976-2005.  (Tr. 252.)  She reviewed his medical history.  (Tr. 251.)

Plaintiff's daily activities included getting up, helping his kids get ready for school, driving them around, doing paperwork and shopping, resting, helping his kids with homework, helping his wife make dinner, reading the paper, playing with his kids or watching television, and doing some cleaning.  (Tr. 252.)  He also liked to watch sports and take his kids to sporting events; he had friends and was involved in the church choir.  (Id.)

On mental status examination, he appeared mildly depressed and mildly anxious, with some difficulties with concentration.  (Id.)  Meyer diagnosed rule out adjustment disorder with depressed mood, and assigned a GAF score of 70.[6]  (Tr. 253.)  She said,

---

[6]     According to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Text Revision 2000), Global Assessment of Functioning ("GAF") scores of 61 to 70 reflect mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well.

"[i]t seems likely that his chronic headache condition is affecting his functioning to some degree and likely has caused some anxious and depressive features."  (Id.)

Plaintiff underwent an independent medical examination with Dr. Gilbert Westreich on May 22, 2006, related to Plaintiff's insurance claim and/or litigation over his November 2005 car accident.  (Tr. 484-87.)  Plaintiff reported that his neck was always stiff and sore, and he had some relief with rest and chiropractic care.  (Tr. 485.)  He took over-the-counter Tylenol twice a week.  (Id.)  On examination, he had full range of motion in the neck, some pain complaints, no spasms observed or palpated, reflexes sluggish to absent, muscle strength normal, sensory exam normal, but he had scoliosis.  (Tr. 485-86.)  Dr. Westreich opined that Plaintiff was in good health relative to the accident, with mild muscular strain from which he had recovered.  (Tr. 487.)  Dr. Westreich did not recommend any restrictions at home or work, and he said Plaintiff could do anything he did before the 2005 accident.  (Id.)

On May 22, 2006, Dr. Ormiston noted the following:

> [Plaintiff] continues to have headaches that are chronic with pain that for the most part is bearable, but several times a week, will increase to a 7 or 8 level, and less often, will increase to a 9 or 10 level.  The headaches are chronic, present constantly and were the subject of intensive evaluation over a couple of years, both from Mayo and from our offices.  At present now, he is very careful with short term pain medicines, taking Tylenol in various combinations, the strongest of which is Fioricet tablets that he uses on  rare occasions.  He estimates that he would take any type of pain medicine that would include. . . plain Tylenol, only once every three weeks, or so.  He otherwise does the best he can.

(Tr. 327.)  In August, Dr. Ormiston noted Plaintiff's headaches had increased with stress, and that Plaintiff recognized "the association of stress and increased headaches."  (Tr. 326.)

Dr. Robert Sheeler completed a Physical Residual Functional Capacity Questionnaire regarding Plaintiff in October 2006.  (Tr. 390.)  He diagnosed post traumatic headache lasting seven years.  (Id.)  He opined that Plaintiff could not work for the following reasons:  pain would constantly interfere with Plaintiff's attention and concentration and persistence and pace; pain would severely limit his ability to handle work stress; he could sit four hours, stand and/or walk two hours; he could never lift and carry less than ten pounds; and he was limited in any exertion.  (Id.)

Plaintiff saw Dr. Ormiston on June 11, 2007.  (Tr. 415.)  Dr. Ormiston noted:

> [Plaintiff] continues to have severe disabling headaches on a regular basis, varying in intensity through the day, generally much more intense when upright, much better when lying down.  The lingering in his story is the presence of a Chiari I malformation with cerebellar tonsils hanging a bit low, not enough that Dr. Nussbaum thought surgery was advisable. On the other hand is the previously abnormal cerebral spinal fluid flow study.  We have thought all along that the two may be connected, that he could have headache on that basis and that the motor vehicle accident I believe of November of 2005 could have aggravated that.

(Tr. 415).  In November, Dr. Ormiston noted some improvement of Plaintiff's headaches with Depakote, but that it caused drowsiness.  (Tr. 458.)

Dr. Ormiston completed a Headache Residual Functional Capacity Questionnaire regarding Plaintiff on March 8, 2008.  (Tr. 459.)  He opined that Plaintiff had muscle contraction headaches that were constant but with varying intensity of mild to severe pain.  (Id.)  Plaintiff's medications included Depakote, Citalopram, Tylenol, Tylenol 3, and Fioricet.  (Id.)  The medications caused side effects of fatigue and nausea.  (Id.)  Dr. Ormiston opined Plaintiff would be absent from work more than three days per month, his persistence or pace would be impaired almost constantly, he would need unscheduled breaks, he would not be safe around dangerous machinery, but his ability to deal with job stress and work with others was good.  (Tr. 459.)

On June 12, 2008, after reviewing Plaintiff's list of his headache frequency and severity, Dr. Ormiston opined it was consistent with previous visits.  (Tr. 471.)  They discussed decreasing to the lowest effective dose of Depakote or eliminating it.  (Id.)  According to Plaintiff's headache log, between March and June 2008, his lowest pain was at a level six out of ten, and his highest pain was nine out of ten.  (Tr. 472-73.)

### The Administrative Hearing

Plaintiff testified as follows at the hearing before the ALJ.  He lived with his wife and two sons, who were ten and nine.  (Tr. 27.)  He last worked in September 2005. (Id.)  His job ended due to his headaches, because he could not do as much as his manager wanted.  (Tr. 28.)  His headaches were always with him, but they fluctuated in severity.  (Tr. 28-29.)  The following things made his headaches worse:  stooping, lifting, head position changes, bright light and noise.  (Tr. 29.)  When his pain increased, he laid down for thirty minutes to an hour or two. (Tr. 30.)  Once every month or two, he

11

had to lay down all day.  (Id.)  He typically rated his headache between seven and eight, with the lowest level being five. (Tr. 31.)

Plaintiff could walk a half mile at an easy pace but less in heat and humidity.  (Tr. 32.)  He could stand for less than fifteen minutes up to thirty minutes.  (Id.)  Heavy lifting caused severe headaches.  (Tr. 33.)  He could sit for a couple of hours on a good day.  (Tr. 34.)  On a bad day, he could only sit thirty minutes or less.  (Tr. 35.)  He had bad headaches two or three times a week, but that also varied with activity.  (Id.)  While he was working, on a bad day, he would lay down in his office two or three times a day. (Tr. 36.)  Pain affected his concentration.  (Tr. 37.)

He could take care of himself most of the time.  (Tr. 37.)  He helped his kids with their homework.  (Id.)  He sometimes missed his kids' school activities due to pain.  (Tr. 38.)

Wayne Onkin testifed at the hearing as a vocational expert.  (Tr. 49.)  The ALJ noted Plaintiff was within six months of turning 55-years-old.  (Tr. 51.)  The ALJ posed some hypothetical questions to the ALJ about the type of work a person with Plaintiff's age, education, working history and impairments could perform.  In the first hypothetical question, the ALJ restricted the person to lifting and carrying twenty pounds occasionally, ten pounds frequently, standing and sitting six hours each out of an eight-hour a day, occasional climbing, balancing, stooping, crouching, and crawling, and occasional exposure to heat and humidity.  (Id.)  The VE testified such a person could perform Plaintiff's past relevant work.  (Id.)  In the second hypothetical question, the ALJ limited the person to standing for two hours but everything else was the same as the first hypothetical question.  (Id.)  The VE testified such a person could still perform

Plaintiff's past work as a computer engineer and advisory engineer.  (Id.)  The third hypothetical question was the same as the second, but added the restriction that the person would miss three or more days of work per month.  (Tr. 52.)  The VE testified that such a person could not perform any work.  (Id.)

**The ALJ's Decision**

On October 9, 2008, the ALJ issued his decision denying Plaintiff's application for disability insurance benefits.  (Tr. 21.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations.  See 20 C.F.R. § 404.1520.  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or medically equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform."  Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant has not engaged in substantial gainful activity since September 30, 2005, the alleged onset date.  (Tr. 16.)  At the second step of the process, the ALJ found that Plaintiff had a severe impairment of headaches.  (Id.)  At the third step of the evaluation, the ALJ

determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 18.)

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; stand two out of eight hours a day; sit for six out of eight hours a day; occasionally climb stairs, ladders, balance, stoop, kneel, crouch, and crawl, with occasional exposure to heat and humidity.  (Tr. 18.)  The ALJ noted that Plaintiff could care for himself, his children, his home, and that he could cook, clean, shop, and drive his children around.  (Tr. 17.)  He also noted that Plaintiff worked 29 years as an engineer and had no difficulty interacting with coworkers, and he had friends and participated in his church choir.  (Tr. 17-18.)  Based on Plaintiff's consultative examination, the ALJ determined that Plaintiff would only have mild limitations in concentration, persistence or pace, because his memory was intact; he was able to follow directions; and he had only minor difficulties with concentration due to headache. (Tr. 18.)

The ALJ concluded that overall Plaintiff's chronic headaches were well managed on medication, which allowed him to participate in a full range of activities.  (Tr. 19.) The ALJ cited evidence that Plaintiff was working overtime in 2005.  (Id.)  He also noted that Plaintiff took various short-term formulations of Tylenol to manage his headaches, and that he only took medication every three weeks or so.  (Id.)  He noted Dr. Ormiston said Plaintiff was able to manage without medication the majority of the time, and he expected that to continue indefinitely.  (Id.)

14

The ALJ gave great weight to the opinion of Dr. Westreich as consistent with other providers.  (Tr. 20.)  Dr. Westreich opined that Plaintiff recovered from the injuries of his November 2005 accident, and was managing his headaches with over-the-counter Tylenol twice a week.  (Tr. 20.)  The ALJ noted that Plaintiff reported to Dr. Westreich that he cared for himself, his home, and children.  (Tr. 19.)  And, Dr. Westreich noted Plaintiff's examination was normal, and he did not place any restrictions on Plaintiff's activities at work or home.  (Tr. 19-20.)  Dr. Westreich opined Plaintiff was able to do the full range of activities that he did before the accident.  (Id.)

The ALJ also relied on evidence that Plaintiff had some pain relief from Depakote; and in June 2008, Plaintiff was doing well enough that Dr. Ormiston was considering eliminating Depakote.  (Tr. 20.)  The ALJ rejected Dr. Ormiston's opinion as inconsistent with his own office visit notes, which indicated Plaintiff was functioning well, and his symptoms were adequately managed with medication.  (Id.)  The ALJ also found Dr. Ormiston's opinion was inconsistent with Plaintiff's activities of daily living.  (Id.)  The ALJ rejected Dr. Sheeler's opinion as inconsistent with office visit notes of other providers.  (Id.)  The ALJ gave significant weight to "the medical records of the Mayo Clinic, the Associates in Psychiatry and Psychology and Dr. Westreich, because they are internally consistent and consistent among providers."  (Id.)

The ALJ relied on the VE's testimony in response to a hypothetical question and concluded that Plaintiff could perform his past relevant work as a computer engineer, electrical engineer, and advisor engineer.  (Id.)  Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security act.  (Id.)

**DISCUSSION**

15

**Standard of Review**

Review by this Court is limited to a determination of whether a decision of the

ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g);

Davidson v. Astrue, 578 F,3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Brace v. Astrue, 578 F.3d 882, 884 (8th Cir. 2009) (quoting Richardson v.

Perales, 402 U.S. 389, 401 (1971) (internal quotation omitted)).  "The substantial

evidence test employed in reviewing administrative findings is more than a mere search

of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler,

811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' .

. . requires a more scrutinizing analysis." Id.

In reviewing the record for substantial evidence, the Court may not substitute its

own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

The Court should not reverse the Commissioner's finding merely because evidence

may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th

Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed,

even if substantial evidence would support the opposite finding.)  Instead, the Court

must consider "the weight of the evidence in the record and apply a balancing test to

evidence which is contrary." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability

benefits.  See 20 C.F.R. § 404.1512(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir.

1991).  Once the claimant has demonstrated he or she can not perform prior work due

to a disability, the burden of proof shifts to the Commissioner to show that the claimant

16

can engage in some other substantial gainful activity.  Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).

### Analysis

Plaintiff raises three main arguments.  First, Plaintiff contends the ALJ mischaracterized his medical records by drawing improper inferences.  Second, Plaintiff contends the ALJ erred in his credibility analysis by not applying the Polaski factors, and instead drew his own inferences upon a limited selection of medical records.  Third, Plaintiff argues the ALJ erred by granting more weight to the opinion of Dr. Westreich than the opinions of his treating physicians.

Defendant contends that substantial evidence in the record as a whole supports the ALJ's decision.  Defendant argues that Dr. Sheeler's opinion of extreme restrictions, including the inability to work even one hour or lift less than ten pounds, is unsupported by Dr. Sheeler's notes.  Defendant also contends it was reasonable for the ALJ to deduce that Dr. Ormiston's opinions provided only that Plaintiff could not work overtime, and his headaches might make productive work in a 40-hour work-week "difficult to achieve."

Defendant also contends that it was reasonable for the ALJ to conclude, based on Dr. Ormiston's notes, that Plaintiff was managing his headaches with only intermittent use of Tylenol-related drugs.  And Defendant contends Dr. Westreich's report accurately stated what Plaintiff reported to him; and Dr. Westreich found nothing physically wrong with Plaintiff.  Defendant concludes that Plaintiff worked a demanding job, although he had headaches from 1999 through 2005, and the record did not establish that Plaintiff's condition significantly altered when he stopped working.  Finally,

Defendant argues that substantial evidence supports the ALJ's credibility analysis, based on Plaintiff's work history and conservative use of medication.

In Reply, Plaintiff argues there are objective findings supporting Plaintiff's subjective complaints, including MRIs of his head and brain.  Plaintiff cites Dr. Ormiston's statement that none of the treatments Plaintiff tried resulted in a significant cure.

### Whether the ALJ Made Improper Inferences

#### Overtime

First, Plaintiff contends the ALJ misinterpreted Dr. Ormiston's March 16, 2005 medical note by stating that it indicated "the claimant was working significant overtime." (Tr. 19.)  Plaintiff contends Dr. Ormiston was only stating that overtime was inadvisable for him, and even a 40-hour work week was difficult.  This Court finds that the record supports the ALJ's inference that Plaintiff was working overtime before he stopped working in September 2005.  There would be little point in Dr. Ormiston writing a letter stating "I would continue to advocate that significant overtime in general is not good for his health condition" (Tr. 665), if Plaintiff were not working overtime.  The fact that Dr. Ormiston also stated it was difficult for Plaintiff to be productive for a 40-hour work week does not lessen the inference that he was in fact working overtime when Dr. Ormiston wrote letters on his behalf in November 2004 and March 2005.

#### Effectiveness of Treatment

Second, Plaintiff contends the ALJ "erroneously implied" that Dr. Ormiston's medical note of May 22, 2006 suggested Plaintiff's headaches could be effectively

treated with Tylenol.  Plaintiff's Memorandum in Support of Motion for Summary
Judgment at 15 (Doc. No. 7).  Plaintiff complains that the ALJ did not acknowledge
various other unsuccessful treatments.  Plaintiff also points out that although Dr.
Ormiston acknowledged that Plaintiff's headache pain was "for the most part" bearable,
he also noted that several times a week his headache would increase to a level seven
or eight, and less often to a nine or ten.  Plaintiff notes that Dr. Ormiston stated nothing
was successful in preventing Plaintiff's headaches, and he just had to manage the best
he could.

Plaintiff did try a number of other treatments that were unsuccessful in resolving
his headaches.  However, he was employed full-time throughout the period when he
had epidural blood patches and other treatment that was aimed toward reducing
headaches caused by CSF leak.  Toward the end of 2003, Dr. Ormiston concluded
Plaintiff's headaches were not caused by CSF leak, and Plaintiff continued to work
almost two more years as he tried various prescription pain medications.

It is true that Plaintiff never reported that any medication or treatment was
effective in eliminating his headaches.  However, a person does not have to be
headache-free to be capable of full-time employment.  See House v. Shalala, 34 F.3d
691, 694 (8th Cir. 1994) ("[a]s is true in many disability cases, there is no doubt that the
claimant is experiencing pain; the real issue is how severe that pain is") (quoting
Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)).  The Eighth Circuit has long
approved discounting a claimant's subjective complaints concerning the severity of pain
in instances where the claimant used over-the-counter medication or infrequently used
prescription pain medication.  See Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996)

(use of only of over-the-counter pain medication suggests severity of pain "is not so great as to preclude light exertional type work"; Rankin v. Apfel, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription pain medication supports discrediting subjective complaints)).  It is a reasonable inference that a person in severe pain would use stronger pain medication.  Plaintiff had prescriptions for Tylenol 3 and Fioricet but used them only rarely.  Additionally, as the ALJ noted, Plaintiff's chronic headaches began in 1999, but he continued to work until September 2005, despite ineffective treatment of his pain.

### Dr. Westreich's Findings

Third, Plaintiff asserts the ALJ mischaracterized Dr. Westreich's findings by implying that Plaintiff had recovered from his physical impairments, including his chronic headaches.  Plaintiff contends Dr. Westreich's findings are only relative to the accident of November 2, 2005, and the report does not specifically address his ongoing headaches.  There is nothing in the ALJ's decision to suggest he mischaracterized Dr. Westreich's report.  When Dr. Westreich examined Plaintiff on May 22, 2006, there were no clinical findings that would support restrictions on Plaintiff's activities at home or work.  Dr. Westreich opined that Plaintiff could return to the full range of activities he performed before the accident.  Until September 30, 2005, Plaintiff's activities included full-time work.  The ALJ did not adopt Dr. Westreich's opinion that Plaintiff had no functional restrictions, but he found Dr. Westreich's opinion more consistent with the record as a whole than Dr. Sheeler's and Ormiston's opinions of disability.  The ALJ's decision, read as a whole, does not suggest he mistakenly believed Plaintiff had

20

recovered from his chronic headaches, but instead that his chronic headaches would not preclude full-time competitive employment.

### Side Effects of Medication

Fourth, Plaintiff argues the ALJ did not adequately address the side effects of Plaintiff's medications.  Plaintiff notes the ALJ relied on evidence that Plaintiff's headache improved some with Depakote, but he did not acknowledge that the improvement was only slight and the medication caused drowsiness.  The Court agrees that the evidence of Plaintiff's improvement with use of Depakote was minimal and therefore, not entitled to much weight.  However, it was only one of a number of factors cited by the ALJ in his analysis, and the finding regarding Depakote was not necessary for the ALJ's decision to be supported by substantial evidence in the record as a whole.

### Volunteer Work

Fifth, Plaintiff contends the statement in a Mayo Clinic record of October 17, 2007, that Plaintiff "volunteers at [his] children's school" is not probative as to the limiting effects of his chronic headaches because it does not say what his volunteer work is, how long he volunteered, or how often.  See Tr. at 420.   Nevertheless, it is part of the evidence as a whole concerning what Plaintiff could and could not do.  It was not error for the ALJ to consider the fact that Plaintiff did some volunteer work at his kids' school, even though the evidence does not indicate any specifics of the volunteer work.

### June 12, 2008 Medical Record

Sixth, Plaintiff argues that the ALJ mischaracterized Dr. Ormiston's note of June 12, 2008, by suggesting Plaintiff was doing well.  Plaintiff contends that the note says

his headaches are consistent with previous visits, which ranged from a level six to nine

out of ten.  Plaintiff also contends the ALJ failed to discuss his pain log, which described

activities that exacerbated his pain.  The ALJ accurately cited Dr. Ormiston's note that

Plaintiff's headache journal was consistent with what Plaintiff reported on previous

visits.  The ALJ stated that Dr. Ormiston and Plaintiff agreed he was "doing well

enough" to decrease or eliminate Depakote.  It was reasonable for the ALJ to infer Dr.

Ormiston and Plaintiff would not have planned to decrease or eliminate his Depakote,

which had previously been noted to offer some pain relief, if his headache remained

unmanageable.  In summary, the ALJ made reasonable inferences regarding the pieces

of evidence discussed above.  See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir.

2008) ("[o]ur case law permits the ALJ's reasonable inferences.")

### Whether the ALJ Erred in His Credibility Analysis

Plaintiff contends the ALJ's credibility finding lacks sufficient analysis, because

the ALJ summarily discredited Plaintiff's accounts of pain by relying on the portions of

the record discussed in the argument above, and by not using the Polaski factors as the

foundation for his credibility analysis.  In considering a claimant's subjective complaints

of disability, the ALJ must assess the claimant's credibility, applying the factors set forth

in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by

Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give

full consideration to all the evidence presented relating to a claimant's subjective

complaints, including prior work record, and observations of third parties and treating

and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness, and side effects of medication; and

5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Cox, 160 F.3d at 1207.  The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of Plaintiff's subjective complaints.  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002). The failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.  See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

It is of no consequence that the ALJ did not methodically list each Polaski factor and discuss the evidence in such a manner.  There is little or no objective evidence in the record to explain Plaintiff's chronic headaches, which were ultimately presumed to be caused by tension.  In a letter to Plaintiff's insurer on March 25, 2004, Dr. Ormiston disavowed the idea that Plaintiff's chronic headaches were caused by chiari malformation or CSF leak, a conclusion that is consistent with all of the negative test results and clinical findings. (Tr. 684.)  There was no new evidence to support Dr. Ormiston's contrary June 2007 statement that chiari malformation and CSF leak "could have" caused Plaintiff's

23

headaches.  (Tr. 415.)  Plaintiff's pain complaints were not supported by objective evidence; and that is one factor, although it cannot be the sole factor, that an ALJ may consider in discounting a claimant's subjective complaints.

In addition to the lack of objective findings to explain the frequency and severity of Plaintiff's headaches, the ALJ cited Plaintiff's primary use of over-the-counter pain medication, and infrequent use of prescription pain medication to treat his headaches.  This finding is supported by substantial evidence in the record on and after Plaintiff's alleged disability onset date.  (Tr. 327, 485, 513.)  The ALJ also cited Plaintiff's activities of daily living as inconsistent with his subjective complaints.  Evidence in the record indicates that Plaintiff engaged in daily activities inconsistent with his complaint of the frequency and severity of his headaches.  His daily activities included helping his kids get ready for school, playing with them, driving them around, taking them to sporting events, doing paperwork and shopping, helping his wife make dinner, watching television and reading the paper, doing some cleaning and yardwork, and being involved in the church choir.  (Tr. 157-62, 252.)

The ALJ also considered Plaintiff's work record.  Plaintiff's long, consistent work record is generally favorable to his credibility.  However, his work record also indicated that he worked for six years after the car accident that precipitated his chronic headaches, and he did not quit working until he had a new manager that did not feel his work was adequate.  Because there is nothing in the record to indicate why Plaintiff's headaches would have caused greater functional restrictions in September 2005 than they had since his car accident in 1999, it was reasonable for the ALJ to infer that Plaintiff stopped working for reasons other than disabling headaches.

24

**Whether the ALJ Erred in Weighing the Medical Opinions**

Plaintiff asserts the ALJ improperly rejected Dr. Sheeler's opinion.  Plaintiff points out that the ALJ did not state which office visit notes were inconsistent with Dr. Sheeler's opinion.  Plaintiff argues the ALJ's opinion is based on the ALJ's misinterpretation of the records discussed above.  Plaintiff contends the record indicates that he had severe headaches since his 1999 car accident, he pursued extensive treatment but his condition worsened until he could no longer work and resigned.  Plaintiff concludes Dr. Sheeler's opinion is consistent with Dr. Ormiston's opinion.

Second, Plaintiff contends the ALJ improperly rejected Dr. Ormiston's opinion.  Plaintiff asserts Dr. Ormiston's treatment notes do not indicate that his headaches were well maintained on medication or that he could function very well.  Instead, Plaintiff asserts Dr. Ormiston's records indicate the chronic nature of his headaches despite ongoing treatment.

Third, Plaintiff argues the ALJ improperly relied on Dr. Westreich's opinion because Dr. Westreich only saw him once, and he did not review any records from Mayo Clinic or Neurological Associates of St. Paul (Dr. Sheeler's and Ormiston's notes).  Plaintiff contends Dr. Westreich did not adequately address his ongoing headaches, because Dr. Westreich was only commenting on his health in relation to the November 2005 car accident.  Plaintiff contends Dr. Sheeler's and Dr. Ormiston's opinions should be entitled to controlling weight due to their treating relationship, objective findings on MRI, and consistency with the record as a whole.  Plaintiff points out there is nothing in the record to support the total alleviation of his headaches.

Although a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record, an ALJ need not accept the opinion if it does not meet those criteria. Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009). If the ALJ does not grant controlling weight to the treating physician's opinion, the ALJ must determine how much weight to grant a non-controlling medical opinion. 20 C.F.R. § 404.1527(d)2. The ALJ must apply the following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion." 20 C.F.R. §§ 404.1527(d), 416.927(d), see also Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).]

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008).

Here, substantial evidence in the record supports the ALJ's decision not to grant controlling weight to Dr. Sheeler's or Ormiston's opinion of disability. First, objective evidence failed to prove that chiari malformation or CSF leak caused Plaintiff's headaches, and Dr. Ormiston eventually concluded Plaintiff's headaches were caused by tension. MRI findings regarding Plaintiff's cervical spine were mild, and he was treated conservatively after it was determined that his headaches were not caused by CSF leak. Dr. Westreich examined Plaintiff and found no functional restrictions. This was consistent with other examinations, including examinations by Dr. Sheeler in April and August 2006, where it was

noted that Plaintiff was fully functional with no "limitations that interfere with his activities of daily living." (Tr. 224, 278, 291.)

Plaintiff worked with his chronic headaches for six years after they began, and there was nothing in the medical record, other than his subjective complaints, to suggest why he could not have continued to do so. Apparently in response to the demands of Plaintiff's new manager, Dr. Ormiston opined that Plaintiff should not work overtime and may have difficulty being productive forty-hours a week, but he did not give Plaintiff any other restrictions leading up to his alleged onset date. (Tr. 666-67.) In fact, on Plaintiff's last visit to Dr. Ormiston before his disability onset date, Dr. Ormiston noted:

> He is actually doing better, I believe. We had increased the Lexapro a bit. . . I encouraged him to stick with it and he is pleased that he got some positive feedback from his boss. He said they're going to be forming a committee to review this and I encouraged him again to fight through this the best he can and work as hard as he can. He actually seems to have a bit of a better attitude today.

(Tr. 231). There is evidence that Plaintiff's new manager was more demanding, which may have motivated him to quit working. (Tr. 651, 686). Although Plaintiff consistently complained of and sought treatment for chronic headaches after his 1999 car accident, the evidence in the record as a whole supports the ALJ's decision not to grant controlling weight to Dr. Sheeler's or Dr. Ormiston's opinion of Plaintiff's disability. For all of the reasons discussed above, the ALJ's decision should be affirmed.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 6] be denied;

2.      Defendant's Motion for Summary Judgment [Docket No. 9] be

granted;

3.      Judgment be entered accordingly.

Dated: May 27, 2011              ___s/ Arthur J. Boylan_____
                                  ARTHUR J. BOYLAN
                                  United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and by serving upon all parties,
written objections which specifically identify the portions of the Report to which
objections are made and the bases for each objection.  This Report and
Recommendation does not constitute an order or judgment from the District Court and it
is therefore not directly appealable to the Circuit Court of Appeals.  Written objections
must be filed with the Court before June 14, 2011.